**TOWN OF HALLIE, Town of Seymour, Town of Union and Town of Washington, Wisconsin townships, Plaintiffs-Appellants,**

v.

**CITY OF EAU CLAIRE, a Wisconsin municipal corporation, Defendant-Appellee.**

No. 82–1715.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1982.

Decided Feb. 17, 1983.

Claude J. Covelli, Boardman, Suhr, Curry & Field, Madison, Wis., for plaintiffs-appellants.

Frederick W. Fischer, Eau Claire, Wis., for defendant-appellee.

Before ESCHBACH, Circuit Judge, COFFEY, Circuit Judge, and WISDOM,* Senior Circuit Judge.

WISDOM, Senior Circuit Judge.

Four towns allege that a city is using a monopoly over sewage treatment services in

---

* Honorable John Minor Wisdom, Senior Circuit Judge for the United States Court of Appeals    for the Fifth Circuit sitting by designation.

the relevant geographic market to gain a monopoly in the markets for sewage collection and sewage transportation in violation of the Sherman Act, 15 U.S.C. § 1 et seq. (1973), the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. (1978), and a state common law duty of a utility to serve. On appeal, the towns contend that the district court erred in dismissing their claims under the Sherman Act on the ground that the conduct in question falls within the state action immunity doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). We conclude that the conduct in question is exempt from the antitrust laws under *Parker* and *Community Communications Company v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), and we affirm the district court's decision.

## I.

The plaintiffs-appellants—Town of Hallie, Town of Seymour, Town of Union, and Town of Washington ("Towns")—are four Wisconsin townships that are adjacent to the City of Eau Claire ("City"). The City used federal funds to build a sewage treatment facility within the city limits, and this sewage treatment facility is the only such facility in the market available to the Towns. As a result, the City enjoys a monopoly in the market for sewage treatment services.[1]

The City has refused to supply sewage treatment services to the Towns. The district court found that the City has provided sewage treatment services to individual landowners in the Towns only if they will agree to become annexed by the City and thereby obtain sewage collection and transportation services from the City. *Town of Hallie v. City of Eau Claire,* No. 80–C–527, slip op. at 1 (W.D.Wisc. April 5, 1982). By

refusing to provide treatment services to the Towns, the City has prevented the Towns from competing in the markets for sewage collection and transportation. The Towns simply have no means of disposing of the sewage once they collect and transport it, so they do not collect it at all.

In their complaint seeking injunctive relief, the Towns alleged that the City's denial of sewage treatment services to them violated the Sherman Act, the Federal Water Pollution Control Act, and a common law duty of a utility to serve. The City moved to dismiss the complaint pursuant to Fed.R.Civ.Pro. 12(b), and the district court granted the motion. The district court dismissed the antitrust claims on the grounds that the City's conduct was exempt from the Sherman Act under *Parker v. Brown.*[2] The district court dismissed the Federal Water Pollution Control Act claim, holding that the Act does not provide a right to sue, that the Towns failed to pursue administrative remedies, and that the Act does not mandate the action that the Towns seek. After dismissing the federal claims, the district court dismissed the pendent state claim.

On appeal, the Towns contest only the denial of their antitrust claims. The Towns contend that the City's conduct is exempt from the Sherman Act only if it is in furtherance of clearly articulated and affirmatively expressed state policy and it is actively supervised by the State of Wisconsin. The Towns contend that state action immunity is unavailable to the City because it has met neither of these two requirements. The City contends that its denial of services to the Towns is authorized by clearly articulated state policy and that state action immunity protects its conduct.

---

**1.** The disposal of sewage is a three-step process. Sewage must be collected from the user, transported to the treatment facility, and treated and disposed of by the treatment facility. The City's monopoly in this case extends only to the third step.

**2.** The Towns brought their antitrust claims under a number of theories. The first claim was that the City used its monopoly over sewage

treatment to gain a monopoly over sewage collection and transportation. The second claim was that requiring the consumer to obtain sewage and collection services in order to gain sewage treatment services constituted an illegal tying arrangement. The third claim was that the City's conduct was an illegal refusal to deal with the Towns.

## II.

In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court addressed the issue whether the federal antitrust laws prohibited the State of California from adopting a program that prevented raisin producers from freely marketing their crop in interstate commerce. The Court held that the marketing program was exempt from the antitrust laws by virtue of limitations in the Sherman Act and concepts of federalism:

> We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

317 U.S. at 350–51, 63 S.Ct. at 313, 87 L.Ed. at 326.

The Supreme Court later addressed the question whether the "state action" immunity exemption of *Parker v. Brown* was available to a state's municipalities.[3] In *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978),[4] a private utility company brought suit under the Sherman Act against several Louisiana cities empowered to own and operate electric utility systems and alleged that they had committed various antitrust offenses in their operation of their utility systems. A majority of the Court rejected the contention that Congress did not intend the Sherman Act to apply to local governments, and a plurality of the Court stated:

> Cities are not themselves sovereign; they do not receive all the federal deference of the states that create them. *Parker's* limitation of the exemption to 'official action directed by a state,' is consistent with the fact that the States' subdivisions generally have been treated as equivalents of the States themselves. In light of the serious economic dislocation which could result if cities were free to place their own parochial interests above the Nation's economic goals reflected in the antitrust laws, we are especially unwilling to presume that Congress intended to exclude anticompetitive municipal action from their reach.

435 U.S. at 412–413, 98 S.Ct. at 1136, 55 L.Ed.2d at 382–83. The Court recognized, however, that the state as sovereign might sanction anticompetitive activity by the municipalities and immunize this activity from antitrust liability.[5] The Court concluded that "the *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with

---

**3.** During the period from 1943 to 1975, the Supreme Court did not address the state action immunity question. Since 1975, the Court has addressed the issue of immunity under *Parker* in seven cases. The Court responded to the concern that states and municipalities were sheltering too much conduct that contravened the antitrust laws, such as restrictive licensing practices, state action serving as a mask for private cartels, and instances of nominal state regulation in which the state took no active role. M. Handler, *Reforming the Antitrust Laws* 59 (1982). There was also the concern that regulated industries control their regulators and that private corporations use the political process to obtain monopoly profits. *See* R. Posner, Economic Analysis of Law 405–07 (2d ed. 1977).

**4.** For a discussion of the Court's decision in *City of Lafayette, see* Areeda, *Antitrust Immunity for "State Action" After* Lafayette, 95 Harv.L.Rev. 435 (1981) [hereinafter "Antitrust Immunity"].

**5.** The Court recognized that municipal corporations are instrumentalities of the state for the convenient administration of government and that a state may choose to effect its policies through the instrumentality of its cities and towns. *City of Lafayette,* 435 U.S. at 413, 98 S.Ct. at 1137, 55 L.Ed.2d at 383. *See Community Communications Co. v. City of Boulder,* 455 U.S. 40, 51, 102 S.Ct. 835, 840, 70 L.Ed.2d 810, 819 (1982).

regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137, 55 L.Ed.2d at 383.[6]

The Supreme Court returned to the issue of state action immunity for municipalities in *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982).[7] The Court addressed the question whether the *Parker* immunity extended to a "home rule" municipality that was granted extensive powers in local and municipal matters by the state constitution. The Court concluded that the restraint in question, a moratorium on the expansion of cable television enacted by the City Council of Boulder,[8] could not be exempt from antitrust scrutiny unless it constituted the action of the State of Colorado itself in its sovereign capacity or municipal action in furtherance of clearly articulated and affirmatively expressed state policy. The Court held that the guarantee of local autonomy to municipalities through the Home Rule Amendment to the Colorado Constitution did not constitute the "clear articulation and affirmative expression" of state policy necessary for anticompetitive conduct to be protected under *Parker.* The Court found that the Home Rule Amend-

ment was neutral with respect to the challenged activity and rejected the City's contention that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances.

### III.

The issue before the Court is to determine if the refusal of the City of Eau Claire to provide sewage treatment facilities to the Towns falls within the protection of *Parker v. Brown* as interpreted in *City of Lafayette* and *City of Boulder.* The holdings of these cases require that municipalities act pursuant to a clearly articulated and affirmatively expressed state policy. Before determining if such a state policy exists, we must resolve two preliminary issues.

First, the Towns contend that the conduct which must be pursuant to state policy is the City's use of monopoly power in sewage treatment services to monopolize sewage collection and transportation. The Towns argue that the district court erred in characterizing the anticompetitive conduct which must be pursuant to state policy as

---

**6.** The Court in *City of Lafayette* reviewed a series of opinions dealing with the *Parker* exemption. The Court discussed *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), which held that the antitrust laws did not apply to a ban on attorney advertising directly imposed by the Arizona Supreme Court. The Court emphasized that the state policy at issue in *Bates* was part of a comprehensive regulatory system, was clearly articulated and affirmatively expressed as state policy, and was actively supervised by the Arizona Supreme Court. *City of Lafayette,* 435 U.S. at 410, 98 S.Ct. at 1135, 55 L.Ed.2d at 381. The Supreme Court in later cases has focused on the language requiring a "clearly articulated and affirmatively expressed state policy" and "active state supervision" in formulating the test to determine if conduct by governmental entities falls within the *Parker* exemption. *See Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

**7.** Between the decisions of *Lafayette* and *Boulder,* the Supreme Court addressed the issue of state action immunity in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,*

445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). The State of California by statute required that wine suppliers set dealer resale prices and that dealers sell at those prices. The Court held that two standards must be met if this anticompetitive conduct were to receive antitrust immunity under *Parker v. Brown.* The challenged conduct must be one clearly articulated and affirmatively expressed as a state policy, and it must be actively supervised by the state. The Court struck down the statutory resale price maintenance scheme because there was no active state supervision over the private parties that were given the power to set prices under the statute. *Id.* at 105–106, 100 S.Ct. at 943, 63 L.Ed.2d at 243.

**8.** The City had enacted a moratorium on the expansion of cable television enterprises for a period of three months to give the City Council time to draft a model cable television ordinance and to invite new businesses to enter the market. The only existing cable television company in Boulder, Community Communications, sought injunctive relief to prevent the ordinance enacting the moratorium from taking effect.

"the City's decision to provide sewage treatment services to the Towns if and only if they also permit the City to provide sewage collection and transportation services via annexation." According to the Towns, the City must point to a state policy authorizing the City's use of monopoly power over sewage treatment to gain monopolies in sewage collection and transportation.

■ We reject the Towns' argument that the authorization of the anticompetitive conduct complained of must be as specific as they request. In *City of Lafayette*, the Court rejected the position "that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it may properly assert a *Parker* defense to an antitrust suit," and the Court went on to state that an adequate state mandate exists when it is found "from the authority given a city to operate in a particular area that the legislature contemplated the kind of action complained of". 435 U.S. at 415, 98 S.Ct. at 1138, 55 L.Ed.2d at 384. In this case, if we can determine that the state gave the City authority to operate in the area of sewage services and to refuse to provide treatment services, then we can assume that the State contemplated that anticompetitive effects might result from conduct pursuant to that authorization.[9] The district court properly focused on determining if authorization for the refusal to provide sewage treatment services exists rather than attempting to find a specific authorization for the monopolizing effect that results from refusing to provide these services. If the state authorizes certain conduct, we can infer that it condones the anticompetitive effect that is a reasonable or foreseeable consequence of engaging in the authorized activity.[10]

■ The second preliminary issue is the contention of the Towns that the City must point to a state policy *directing* or *compelling* the challenged conduct to gain *Parker* protection. There has been a great deal of confusion over whether the state must compel a municipality to undertake an anticompetitive activity in order to receive immunity under *Parker*. This confusion arose because of language in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572, 587 (1975), and *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 600, 96 S.Ct. 3110, 3122, 49 L.Ed.2d 1141, 1155 (1976), which appeared to require state compulsion as a prerequisite for municipal immunity. We conclude that state compulsion is not required. It is clear in *City of Lafayette* and *City of Boulder* that the only immunity available to municipalities is that derived from the immunity granted to the states in *Parker*. The critical inquiry is to determine if the anticompetitive conduct undertaken by a municipality constitutes state action. We hold that any municipality acting pursuant to clearly articulated and affirmatively expressed state policy which evidences an intent of the legislature to displace competition with regulation—whether compelled, directed, authorized, or in the form of a prohibition—is entitled to antitrust immunity because conduct pursuant to such a policy would constitute state action.

■ Recent Supreme Court cases support our conclusion that compulsion is not required. The Court in *City of Boulder* and *City of Lafayette* explained that a state must only authorize the municipal activity for the *Parker* exemption to apply,[11] and many commentators have rejected the no-

9. *See Antitrust Immunity,* 95 Harv.L.Rev. at 445–46 (1981): "The Supreme Court has found it sufficient that 'the legislature contemplated the kind of action complained of.' A policy to displace antitrust laws will then be inferred if the challenged restraint of competition is a necessary or reasonable consequence of engaging in the authorized activity." *Id.* (quoting *City of Lafayette,* 435 U.S. at 415, 98 S.Ct. at 1138, 55 L.Ed.2d at 384).

10. *See* P. Areeda, *Antitrust Law* § 212.3a, at 53–54 & n. 8 (Supp.1982) ("The courts have recognized that state statutes need not confer authorization expressly. It would be sufficient, the Supreme Court said, that 'the legislature contemplated the kind of action complained of.' A policy to displace the antitrust laws will then be found if the challenged restraint of competition is a necessary consequence of engaging in the authorized activity.").

11. The court stated in *City of Boulder:*

tion that compulsion is required.[12] Obviously, if the state compels or directs a municipality to undertake anticompetitive conduct, this compulsion or direction is strong evidence of a state policy to displace the antitrust laws. We hold that the City must show only that clearly articulated and affirmatively expressed state policy authorizes the City's refusal to provide sewage treatment to the Towns to gain the state action immunity of *Parker*.

### IV.

█ The Towns contend that the City's refusal to extend sewer services to them is not pursuant to clearly articulated and affirmatively expressed state policy. We disagree. Several statutes and court decisions interpreting those statutes give the City authority to decide where to extend sewer services and to insist on annexation as a condition to extending sewer services to the surrounding area.

Section 66.069(2)(c) of the Wisconsin Statutes provides that a city may fix the area in which to extend sewage services, and that a city has no obligation to serve beyond that area.[13] This statute authorizes the City to fix the limits of its utility service and expressly provides that the City "shall have no obligation to serve beyond the area so delineated." In addition, section 144.07(lm) of the Wisconsin Statutes provides that the department of natural resources may order a city to extend its sewerage system to a town, but if that town then refused to become annexed to the city, the order becomes void and the city has no obligation to extend the sewerage system.[14] This statute

---

Moreover, judicial enforcement of Congress' will regarding the state action exemption renders a state "no less able to allocate governmental power between itself and its political subdivisions. It means only that when the State itself has not directed *or authorized* an anticompetitive practice, the State's subdivision in exercising their delegated power must obey the antitrust laws."

455 U.S. at 56–57, 102 S.Ct. at 843, 70 L.Ed.2d at 822 (citations omitted) (emphasis supplied). In *City of Lafayette,* the Court stated:

Today's decision does not threaten the legitimate exercise of governmental power, nor does it preclude municipal government from providing services on a monopoly basis. *Parker* and its progeny make clear that a State properly may . . . direct *or authorize* its instrumentalities to act in a way which, if it did not reflect state policy, would be inconsistent with the antitrust laws.

435 U.S. at 416–17, 98 S.Ct. at 1138, 55 L.Ed.2d at 385 (emphasis supplied), *quoted in City of Boulder,* 455 U.S. at 57, 102 S.Ct. at 844, 70 L.Ed.2d at 822.

**12.** *See* P. Areeda, *Antitrust Law* § 212.5 (Supp. 1982); M. Handler, *Reforming the Antitrust Laws* 64–65 (1982); *Antitrust Immunity,* 95 Harv.L.Rev. at 445 ("*Lafayette* does not require that governmental acts be compelled or supervised by the state. Rather, it demands that the legislature have *authorized* the challenged activity with an intent to displace the antitrust laws.") (emphasis supplied); Page, *Antitrust Federalism, and the Regulatory Process: A Reconstruction and Critique of the State Action Exemption After* Midcal Aluminum, 61 B.U.L. Rev. 1099, 1122 n. 141 (1981).

**13.** Section 66.069(2)(c) provides:

Notwithstanding § 196.58(5), each village or city may by ordinance fix the limits of such service in unincorporated areas. Such ordinance shall delineate the area within which service will be provided and the municipal utility shall have no obligation to serve beyond the area so delineated. Such area may be enlarged by a subsequent ordinance. No such ordinance shall be effective to limit any obligation to serve which may have existed at the time the ordinance was adopted.

We note that § 66.069(2)(c) applies to water utilities. Its provisions, however, are incorporated into the statute governing municipal sewage systems by § 66.076(8).

**14.** Section 144.07 provides:

An order by the department for the connection of unincorporated territory to a city or village system or plant shall not become effective for 30 days following issuance. Within 30 days following issuance of the order, the governing body of a city or village subject to an order under this section may commence an annexation proceeding under § 66.024 to annex the unincorporated territory subject to the order. If the result of the referendum under § 66.024(4) is in favor of annexation, the territory shall be annexed to the city or village for all purposes, and sewerage service shall be extended to the territory subject to the order. If an application for an annexation referendum under § 66.024(4) is against the annexation, the order shall be void. If an annexation proceeding is not commenced within the 90-day period, the order shall be effective.

is evidence of a state policy to require annexation as a condition to receiving municipal services.

Our conclusion that state policy authorizes the City to refuse sewage treatment services unless the purchaser becomes annexed is strengthened by the holding of *Town of Hallie v. City of Chippewa Falls,* 105 Wis.2d 533, 314 N.W.2d 321 (1982). The Town of Hallie brought suit against Chippewa Falls under the state antitrust laws for the refusal of Chippewa Falls to provide sewage treatment facilities to the Town of Hallie unless the Town agreed to obtain other municipal services from Chippewa Falls. When the Town did not agree, the City annexed a portion of the Town. The court relied on the broad home rule provisions under Wisconsin law and §§ 66.-069(2)(c) and 144.07(lm) to hold that state antitrust law did not apply to this conduct. The court stated:

> Although the statutes do not specifically so provide, it seems that the legislature viewed annexation by the city of a surrounding unincorporated area as a reasonable quid pro quo that a city could require before extending sewer services to the area. . . .

> While the facts of the present case are clearly not covered by this statute because no DNR order is involved, [sec. 144.07(lm)] is still helpful in indicating that the legislature seems to view annexation as an appropriate prerequisite to the provision of sewage service outside the limits of a city. This seems reasonable because establishing and maintaining sewage treatment facilities can be a very substantial financial burden upon the city taxpayers and residents. If an area is to have the benefit of such services, it may be appropriate for it to be annexed in order to add to the city's tax base and help pay for the cost of providing such services.

314 N.W.2d at 325–26.

The *Town of Hallie* decision and the statutes that it interprets show that there is a clearly articulated and affirmatively expressed state policy not to burden municipalities with providing services unless they can annex the territory that they service. The City acted pursuant to and in a manner consistent with this policy by refusing to provide sewage treatment services to the Towns unless they agreed to become annexed and acquire the full range of sewage services. We hold that the conduct of the City in refusing to provide these services meets the standards of the *City of Boulder* requiring that the anticompetitive conduct was in furtherance of clearly articulated and affirmatively expressed state policy.

V.

The Towns contend that the State of Wisconsin must actively supervise the anticompetitive conduct for the City to gain the protection of *Parker v. Brown.* The "active state supervision" requirement arose in *California Retail Liquor Dealers Association v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). *Midcal* involved a California statutory scheme allowing private wine suppliers to establish a program of resale price control to be enforced by the state. The State of California neither established nor reviewed the prices set by these private decision makers. The Supreme Court struck down the state law because it created a private price-setting mechanism that the state did not supervise. The Court concluded, "The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Midcal,* 445 U.S. at 106, 100 S.Ct. at 943, 63 L.Ed.2d 243.

■ We do not conclude that *Midcal* requires active state supervision over the con-

---

The constitutionality of § 144.07(lm) was upheld in *City of Beloit v. Kallas,* 76 Wis.2d 61, 250 N.W.2d 342 (1977). The court held the statute balanced and accommodated two matters of state concern: providing vital services to areas surrounding cities and the growth or expansion of cities or villages, with annexation as a means to bring all municipal services to areas annexed.

duct in this case.[15] The *Midcal* case involved private parties that were given power over price and that were free of state supervision. In this context, the requirement of active state supervision ensures that the private parties not abuse the anticompetitive power given to them and act pursuant to the state policy at stake. This case involves a local government performing a traditional municipal function. Supervision is unnecessary because local governments operate pursuant to clearly articulated and affirmatively expressed restraints imposed by the state in its policies and delegation of authority. If the conduct of local government in providing municipal services is authorized by the state and is clearly articulated and affirmatively expressed as state policy, the activity is state action and entitled to immunity even though state supervision does not exist.[16]

We also conclude that requiring active state supervision over a traditional municipal function would be unwise. A requirement of active state supervision would erode the concept of local autonomy and home rule authority which is expressed in the statutes and constitution of Wisconsin. States would be required to supervise all local actions if municipalities are to avoid antitrust exposure, and courts would have to make the difficult determination of what "active" supervision is in terms of frequency and effectiveness.[17] We doubt that the Court in *Midcal* intended that the states spend their limited resources actively supervising the traditional governmental functions of their municipalities so that they can avoid antitrust liability.

■ We hold, therefore, that a state is not held to the high standard of active supervision of the conduct of a city performing a traditional municipal function for that city to receive *Parker v. Brown* immunity.[18] The only requirement for receiving immunity when a traditional municipal

15. In the *City of Boulder,* the Supreme Court left open the question whether a municipality must show active state supervision over its conduct in order to receive immunity under *Parker v. Brown:* "Because we conclude in the present case that Boulder's moratorium ordinance does not satisfy the 'clear articulation and affirmative expression' criterion, we do not reach the question whether that ordinance must or could satisfy the 'active state supervision' test focused upon in *Midcal.*" *City of Boulder,* 455 U.S. at 51 n. 14, 102 S.Ct. at 841 n. 14, 70 L.Ed.2d at 819 n. 14.

In *Pueblo Aircraft Service v. City of Pueblo,* 679 F.2d 805 (10 Cir.1982), the Court did not require active state supervision for the City of Pueblo to receive *Parker v. Brown* immunity. The conduct in this case involved the City's operation of a municipal airport. The Court concluded that the key inquiry was whether the State of Colorado by affirmative legislative action granted the City an exemption from the operation of the antitrust laws by virtue of statutory language giving municipalities the authority to acquire and operate a municipal airport. Under this standard, the Court held the City's conduct to be exempt from the antitrust laws.

16. *See* P. Areeda, *Antitrust Law* § 212.2a, at 47 (Supp.1982) ("Thus, requiring state authorization for local conduct is analogous to requiring active supervision of private conduct; it tests whether challenged local activity is truly state action and therefore entitled to immunity."); *Antitrust Immunity,* 95 Harv.L.Rev. at 445 & n. 49 ("*Lafayette* does not require that government acts ... be supervised by the state.") ("a few courts erroneously appear to use the *Midcal* formula (clearly articulated state policy plus active public supervision of *private* parties) to require state supervision of governmental defendants"); Rogers, *Municipal Antitrust Liability in a Federalist System,* 1980 Ariz.St. L.J. 305, 340–342 ("It is questionable whether a showing of active state supervision is necessary for political subdivisions to gain *Parker* immunity, however, in spite of the seemingly unequivocal language of *California Retail Liquor.*"). For an argument that the Supreme Court should abandon the active state supervision requirement completely, see Page, *Antitrust, Federalism, and the Regulatory Process: A Reconstruction and Critique of the State Action Exemption After* Midcal Aluminum, 61 B.U.L.Rev. 1099 (1981).

17. *See City of Boulder,* 455 U.S. at 71 n. 6, 102 S.Ct. at 851 n. 6, 70 L.Ed.2d at 831 n. 6 (Rehnquist, J., dissenting) ("The Court understandably avoids determining whether local ordinances must satisfy the 'active state supervision' prong of the *Midcal* test. It would seem rather odd to require municipal ordinances to be enforced by the State rather than the city itself.")

18. We reserve the question whether a municipality undertaking anticompetitive activity that falls outside the scope of a traditional governmental function must be actively supervised by the state to receive *Parker v. Brown* immunity.

function is involved is that the challenged restraint must be in furtherance or implementation of clearly articulated and affirmatively expressed state policy. We do not question the holding of *Midcal,* but we conclude that the Court's concerns with the private price-fixing arrangement in that case are not present when local governments created by state law carry out governmental functions pursuant to clearly articulated and affirmatively expressed state policy.

## VI.

Our examination of Wisconsin statutes and case law reveals that the challenged conduct is in furtherance of a clearly articulated and affirmatively expressed state policy. On the facts of this case, we conclude that the City must make no other showing to be entitled to immunity under *Parker v. Brown.* We hold that the district court properly dismissed the antitrust counts against the City, and we affirm the judgment of the district court.

This reflects our belief that traditional municipal activity undertaken pursuant to clearly articulated and affirmatively expressed state policy and designed to promote public health and safety should be free from antitrust attack. When municipal activity strays from these functions, which includes the provision of basic services such as sewerage and sanitation, there is a more significant threat to free competition that may warrant active state supervision. *See The Supreme Court, 1981 Term,* 96 Harv.L.Rev. 62, 171–273 (1982).